**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:24-cr-0125 (LMB) |
| | ) | |
| JOSE ALEJANDRO | ) | Trial:  October 22, 2024 |
| BELMONTE CARDOZO | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DEFENDANT'S MOTION TO SUPPRESS EVIDENCE</u>

Comes now, Defendant Jose Alejandro Belmonte Cardozo, by counsel, and respectfully submits this Motion to Suppress Evidence.  Mr. Belmonte Cardozo is a United States citizen who was returning to the United States from a visit with family in Bolivia when United States Customs and Border Patrol ("CBP") agents conducted a warrantless search of two Apple iPhones he carried with him.  The government does not allege that these searches were supported by reasonable, articulable suspicion of crime.  Instead, the government alleges that the initial searches of the iPhones required no level of suspicion because they occurred at a point of entry and thus fall under the border-search exception to the warrant requirement.  The precedent on which the government relies, however, held that reasonable suspicion of an ongoing transnational crime *is* required for a forensic search of a smartphone as part of a border search, and *did not decide* what level of suspicion is required for an initial, "manual" search of such a device.  *See United States v. Kolsuz*, 890 F.3d 133, 140 n.2 (4th Cir. 2018).

Even a "manual" search of a modern iPhone, however, can reveal all the same highly personal information that was at issue in *Kolsuz*, and that the Supreme Court has since *Kolsuz* found to require a warrant in other contexts. For example, in *Carpenter v. United States*, 585 U.S. 296 (2018) (decided shortly after *Kolsuz*), the Supreme Court held that a request for a few months' worth of a mobile phone's cell site location information was so intrusive to the user's protected privacy interests that a warrant is required. Even a quick "manual" search of a modern iPhone reveals orders of magnitude more than that: the owner's *entire* location history—not just a few months—is saved by default unless the user disables the feature or deletes the data. Moreover, all this information is revealed with just a few clicks and requires no forensic software or particularized expertise.[1] And location is but one type of information that a manual search of an iPhone can easily reveal—a quick manual search can readily identify messaging history, contacts, emails, social media usage, browsing history, calendar entries, financial information and much more.

Accordingly, there is no basis for distinguishing a non-forensic "manual" search of an iPhone at the border from the "forensic" search held to require reasonable suspicion in *Kolsuz*. That is particularly true where, as here, that initial search was so thorough that it revealed things like "hidden" folders within the phone's photo

---

[1]    *See* https://www.howtogeek.com/437871/how-to-find-your-location-history-on-iphone-or-ipad/#find-your-location-history-on-your-iphone-or-ipad.

The information stored under "location history" is specific: not just city and state, but street addresses matched to the time and date the phone was at each location. Further, though not relevant here, this is true not just of iPhones but of smartphones in general because Android phones come with the same functionality.

gallery application that are designed to be hidden from users other than the phone's owner. Rather, because both types of search involve a nearly identical intrusion into Fourth-Amendment-protected privacy rights, both types of search, following the holding of *Kolsuz*, should be permitted only upon reasonable suspicion of an ongoing transnational offense. And because there is no precedent holding that a highly intrusive manual search of a smartphone at the border requires no level of suspicion—a question expressly left open in *Kolsuz*—the government cannot rely on good faith reliance on binding precedent to justify its conduct here.

All the evidence in this case was derived directly from the initial, warrantless and suspicionless searches of Mr. Belmonte Cardozo's iPhones, and from investigation exploiting the fruit of those searches.[2] Accordingly, because those searches were not based on reasonable, articulable suspicion of criminal activity— much less of an ongoing transnational offense that would justify an intrusive border search—all evidence derived as a result of those searches should be suppressed.

## FACTUAL BACKGROUND

Mr. Belmonte Cardozo was arrested at Dulles Airport for transportation of child pornography upon his entry to the United States on an international flight on May 8, 2024. Upon arrival, he was referred by CBP to "secondary inspection," where

---

[2]     To be clear, the government claims that it had *some* type of suspicion about Mr. Belmonte Cardozo before he arrived at the border. But in response to a discovery request relating to the basis for that suspicion, it has expressly disclaimed reliance on that information as a basis for the border search of his iPhones and has refused to produce any relevant discovery that would allow the defense or the Court to assess the basis for that suspicion.

officers found him to be in possession of two iPhones.  Upon requesting the passcodes to the iPhones from Mr. Belmonte Cardozo, CBP officers conducted a search of the phones and found photos and videos in a "hidden" folder in the photos application. Some of those photos and videos allegedly constitute child pornography.  Their discovery resulted in Mr. Belmonte Cardozo's arrest as well as the seizure of the phones.

Mr. Belmonte Cardozo was later charged by Indictment with transportation of child pornography in violation of 18 U.S.C. § 2252(a)(1) and (b)(1), and then by superseding indictment with that offense as well as attempted production of child pornography in violation of 18 U.S.C. § 2251(a)(1) and (e) and coercion and enticement of a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b).  The initial offense was premised on the materials found during the initial search of his iPhones at the border, while the two additional offenses are premised upon information obtained through further investigation arising from the evidence obtained in the initial iPhone searches.

## ARGUMENT

I.    Exceptions to the Warrant Requirement are Construed Only as Broadly as Necessary to Accommodate the Justification for Each Exception.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  "Evidence gathered as fruit of an unreasonable search or seizure is generally inadmissible against a defendant." *United States v. Brown*, 401 F.3d 588, 592 (4th Cir. 2005) (citing *Taylor v. Alabama*,

457 U.S. 687, 694 (1982); *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963)). The Supreme Court has repeatedly emphasized that "'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

The government bears the burden to establish that a warrantless search or seizure falls within an exception to the warrant requirement. *E.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). When the government invokes an exception to justify a warrantless search, the exception must be construed no more broadly than necessary to accommodate the exigency justifying the exception. *See Gant*, 556 U.S. at 335 ("The safety and evidentiary justifications underlying *Chimel's* reaching-distance rule determine *Belton's* scope.") (referring to *Chimel v. California*, 395 U.S. 752 (1969), and *New York v. Belton*, 453 U.S. 454 (1981)). Exceptions to the Fourth Amendment's warrant requirement must be "jealously and carefully drawn," accompanied by "a showing by those who seek exemption that the exigencies of the situation made that course imperative." *Coolidge*, 403 U.S. at 455 (internal quotations and citations omitted). "Over and over again," the Supreme Court has "emphasized that the mandate of the Fourth Amendment requires adherence to judicial processes." *Katz*, 389 U.S. at 357 (internal quotation and alteration omitted).

Ultimately, *Gant* explains, the concerns underlying a warrant exception "define the boundaries of the exception." *Gant*, 556 U.S. at 339. To construe an

exception to justify a warrantless search even when the concerns supporting the relevant warrant exception have dissipated would impermissibly "untether the rule from [its] justifications." *Id.* at 343. An exception construed so broadly serves "no purpose except to prove a police entitlement," which is "anathema to the Fourth Amendment." *Id.* at 347. After *Gant,* the Supreme Court in *Riley v. California,* 573 U.S. 373 (2014), applied the same analysis to cell phones. Specifically, *Riley* held that a warrant is required to search a mobile phone incident to arrest because, while a "mechanical application" of the search-incident-to-arrest exception "might well support" a warrantless search of a cell phone following an arrest, the interests that justify searches incident to arrest—officer safety and destruction of evidence—do not. 573 U.S. at 386.

II.     The Law is Clear: Searches of Modern Smartphones Raise Unique Privacy Concerns Warranting Fourth Amendment Protection Even Where a Warrant Exception Might Otherwise Authorize a Warrantless Search.

The Supreme Court's holding in *Riley* was premised in large part on the unique Fourth Amendment implications of modern smartphones. *See Riley,* 573 U.S. at 393-94:

> Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom.
>
> Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. The term "cell phone" is itself misleading shorthand; many of these devices are in fact

> minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.
>
> One of the most notable distinguishing features of modern cell phones is their immense storage capacity. Before cell phones, a search of a person was limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy. *See* Kerr, *Foreword: Accounting for Technological Change*, 36 Harv. J.L. & Pub. Pol'y 403, 404–405 (2013). Most people cannot lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read—nor would they have any reason to attempt to do so. And if they did, they would have to drag behind them a trunk of the sort held to require a search warrant in [*United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)] rather than a container the size of the cigarette package in [*United States v. Robinson,* 414 U.S. 218 (1973)].

Four years later, the Court was presented with a related question in *Carpenter*—whether a request under the Stored Communications Act directing a mobile phone service provider to produce 127 days' worth of cell site location information ("CSLI")—*i.e.,* the locations of the cellular network towers to which a particular phone had connected throughout the relevant time period—required a warrant. Holding that a warrant was required, the Court noted "the deeply revealing nature of CSLI, [as well as] its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection." *Carpenter*, 585 U.S. at 320.

CSLI is less specific than GPS location information (which is at issue here), but the Court nonetheless held that "[a]s with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his

particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 311 (citation and quotations omitted). Moreover, the Court noted, such location monitoring is even more intrusive than placing a GPS tracking device on a vehicle—a practice it had already held to require a warrant—because, "[w]hile individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.*

Accordingly, just as the Court in *Riley* departed from the otherwise applicable search-incident-to-arrest exception to hold that cell phones require heighted Fourth Amendment protection as compared to other items a person might carry upon arrest, so too did the Court in *Carpenter* depart from the "third party doctrine" to hold that the intrusiveness of CSLI collection was *sui generis*—it intrudes upon a mobile phone user's protected expectation of privacy even though the information was shared with and retained by a third party (the mobile phone carrier). *Carpenter*, 585 U.S. at 320.

III.    The Fourth Circuit Has Not Addressed Whether a Thorough Manual Search of a Smartphone at the Border Requires Reasonable Suspicion.

As already noted, the Fourth Circuit in *Kolsuz* addressed in part the application of the border-search exception to smartphones. Specifically, the *Kolsuz* court held that, "in light of the Supreme Court's decision in *Riley* [but before its decision in *Carpenter*], a forensic border search of a phone must be treated as nonroutine, permissible only on a showing of individualized suspicion" relating to

"ongoing transnational crime." *Kolsuz*, 890 F.3d at 144.[3] *See also United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (noting that, following *Kolsuz*, "the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband").  The connection to ongoing transnational crime is necessary because the "Government may not "invoke[] the border exception on behalf of its generalized interest in law enforcement and combatting crime." *Kolsuz*, 890 F.3d at 143.

In *Kolsuz*, however, because the relevant evidence was discovered after the phone had been seized for a forensic examination, the Fourth Circuit did not address whether the CBP officer's initial manual review implicated the same concerns as the later forensic review.  *See Kolsuz*, 890 F.3d at 140 n. 2 ("On appeal, Kolsuz expressly disclaims any challenge to the manual search of his phone at Dulles, which in any event did not reveal information used against him at trial."); *id.* at 146 n. 5 ("we have no occasion here to consider whether *Riley* calls into question the permissibility of suspicionless manual searches of digital devices at the border.").

---

[3]     Border searches are divided into "routine" searches, which require no level of suspicion, and those "that are the most invasive of privacy . . . [which] are deemed nonroutine and permitted only with reasonable suspicion." *Kolsuz*, 890 F.3d at 144. Thus, if a particular type of search is deemed sufficiently intrusive that it is "non-routine," it must be predicated on reasonable suspicion even within the context of the government's broad authority to conduct searches at the border.

Ultimately, the search at issue in *Kolsuz*, although it was conducted using forensic software, revealed exactly the same types of information that could have been revealed through a manual review of the phone: "personal contact lists, emails, messenger conversations, photographs, videos, calendar, web browsing history, and call logs, along with a history of Kolsuz's physical location down to precise GPS coordinates." 890 F.3d at 139. Moreover, the *Kolsuz* search was *not* the sort of even-more-intrusive search using forensic software that identifies items that an ordinary user could not see, such as "residual data of files that had been deleted by" the user. *Id.* at 145 n. 4.

The question left open in *Kolsuz*—whether a non-forensic (but equally thorough) search of a smartphone at the border requires individualized suspicion of ongoing transnational crime—remains unanswered within the Fourth Circuit. *See United States v. Nkongho*, 107 F.4th 373, 384 (4th Cir. 2024) (affirming seizure of smartphone, followed nine days later by a warrant-based forensic search, because the seizure itself was predicated on at least reasonable suspicion of "an ongoing international fraud scheme" and thus permitted under *Kolsuz*).[4]

---

[4]    The Fourth Circuit law prior to *Kolsuz* (which also pre-dates *Riley* and *Carpenter*) offers limited guidance. In *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005), for example, the court upheld a manual search of a laptop computer as a routine border search, reasoning that it was akin to any other "cargo" a traveler carries. 393 F.3d at 507-08. Thus, *Ickes* conflicts with *Riley's* later exposition of why a smartphone is so dramatically *different* than any other item an ordinary person carries as to require a different level of protection under the Fourth Amendment. Further, *Ickes* dealt with a laptop searched in August of 2000, well before modern smartphones were in common use. To equate a manual search of a laptop in 2000 with a that of a smartphone in 2024—because both are "electronic devices"—is akin

IV.    While the Fourth Circuit Has Not Answered the Question Presented Here, the Reasoning of *Kolsuz* and Other Cases Addressing Non-Routine Border Searches Supports a Requirement of Reasonable Suspicion on These Facts.

In distinguishing between routine border searches (which do not require any level of suspicion) and nonroutine border searches (which require at least reasonable suspicion that the search will reveal contraband or evidence of ongoing transnational crime) courts look to the extent of the privacy interests at stake. Thus, nonroutine border searches include "highly intrusive searches" that implicate particularly important "dignity and privacy interests," as well as destructive searches and searches carried out in a "particularly offensive" manner. *See United States v. Flores–Montano,* 541 U.S. 149, 152, 154 & n.2, (2004).

*Kolsuz* held, in light of *Riley*, that a search of a smartphone that revealed all the same information as would a thorough manual search, such as text messages, photos, browsing history and location history (*see* 890 F.3d at 139)—but did *not* use forensic software that revealed more than an ordinary user would see (*see* 890 F.3d at 145 n.4)—constitutes a non-routine search implicating the concerns raised in *Flores-Montano*. Thus, reasonable suspicion is required to justify such a search. Further, in order to tether such a border search to its constitutional justification, that individualized suspicion must go to the existence on the device of either contraband or evidence of transnational crime.

Here, the search of Mr. Belmonte Cardozo's iPhones is not materially distinguishable from the search in *Kolsuz*. The search required Mr. Belmonte

---

to applying a Fourth Amendment case involving a 1970s rotary-dial phone to a modern smartphone on the ground that both are "phones."

-11-

Cardozo to provide his passcodes to CBP.  Once he did so, the agents could see everything that was revealed in *Kolsuz*—""personal contact lists, emails, messenger conversations, photographs, videos, calendar, web browsing history, and call logs, along with a history of [the user's] physical location down to precise GPS coordinates." *See Kolsuz*, 890 F.3d at 139.  Moreover, given the user-friendliness of modern smartphones, accessing all this information required no more than a few clicks, and retrieving it required no specialized software or forensic expertise.  And while Mr. Belmonte Cardozo does not know the precise amount of time that agents spent rummaging through his phone (the defense believes that the search lasted between one and three hours), the search was at least thorough enough to identify and search folders that were "hidden," and thus designed to be invisible to ordinary users.

In these circumstances, all the concerns identified in *Kolsuz*, *Riley* and *Carpenter* combine to demonstrate that the search in this case was highly intrusive, impinged on protected Fourth Amendment rights, and was an example of the government "invoke[ing] the border exception on behalf of its generalized interest in law enforcement and combatting crime" rather than protecting the border.  *Kolsuz*, 890 F.3d at 143.  Indeed, given the ease with which digital data typically crosses borders—to give just a few examples, it can be emailed or it can be uploaded to the "dark web" in one country and downloaded in another—it is hard to imagine that a search for digital contraband at the border can be anything *other than* an exercise of the government's generalized interest in law enforcement.  That is because—unlike with drugs or other physical contraband—border searches for digital items are

unlikely to have any discernible impact on the importation of contraband into the country.

Accordingly, under *Kolsuz*, the search at issue here exceeded the scope of a routine border search and violated Mr. Belmonte Cardozo's protected right to privacy. It can survive Fourth Amendment scrutiny, therefore, only if justified by individualized suspicion of either contraband or evidence of transnational crime, of which there is none in this case.

V.     The Good Faith Exception Does Not Justify the Warrantless and Suspicionless Search of the iPhones Here Because CBP Was Expanding Upon, Rather than Relying Upon, Binding Precedent.

The government's likely response in the event that the Court finds that the searches here required reasonable suspicion—that it was acting in good-faith reliance on existing law—does not excuse its violation of the Fourth Amendment. It is true that good faith reliance by law enforcement on binding precedent, in the case of a search later held to be unconstitutional, informs the cost-benefit analysis of the exclusionary rule and can allow the admission even of evidence held to have been obtained in violation of the Fourth Amendment. But the cases require not only good faith reliance on binding appellate precedent, but also that the officers did "exactly what the law at the time said" they could do. *United States v. Baker*, 719 F.3d 313, 321 (4th Cir. 2013); *see also Davis v. United States*, 564 U.S. 229, 241 (2011) (deterrent effect of exclusionary rule does not apply "when binding appellate precedent specifically authorizes a particular police practice" later deemed unconstitutional) (emphasis in original).

Here, as already noted, the Fourth Circuit has expressly left open the question presented here. Nor has the Supreme Court addressed it. Accordingly, there is no "binding appellate precedent" establishing that a thorough and exhaustive "manual" search of a modern smartphone at the border can be undertaken without reasonable suspicion of an ongoing transnational border crime. The government cannot premise good-faith reliance on the *absence of precedent* telling it what it *cannot* do to assume that it *can do* whatever has not been expressly forbidden—but that is what it is trying to do here. Accordingly, the good-faith-reliance-on-precedent line of cases has no application on these facts.

## CONCLUSION

For the foregoing reasons, the Court should order the exclusion of all evidence derived from the warrantless and suspicionless searches of Mr. Belmonte Cardozo's smartphones, as well as all evidence that was a fruit of those searches.

Respectfully submitted,

JOSE ALEJANDRO BELMONTE
CARDOZO

By Counsel,

Geremy Kamens,
Federal Public Defender


By:                    /s/
Todd Richman
Assistant Federal Public Defender
VA Bar Number 41834
Counsel for Mr. Belmonte Cardozo
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
703-600-0845
703-600-0880 (fax)
todd_richman@fd.org